LANDRY, Judge.
Plaintiff, Jerry K. Nicholson (Nicholson) takes this devolutive appeal from the judgment of the trial court rejecting and dismissing his suit for judicial recognition and enforcement by injunction, both prohibitive and mandatory, of a servitude of drain in favor of appellant’s estate known as Eldorado Plantation (Eldorado) over the adjoining property of defendant Holloway Planting Company, Incorporated (Holloway) known as Kenmore Plantation (Kenmore) which bounds Eldorado on the south. Appellant basically contends his properties are entitled to drain onto defendant’s lands through seven conduits or waterways formed by natural forces and known as “crevasse channels.” Defendant’s primary defense is that Eldorado is not situated “above” Kenmore and therefore is not a dominant estate consequently no servitude *564 of drain exists in favor of the former upon the latter. Alternatively, defendant contends the manner in which plaintiff seeks to exercise the alleged servitude exceeds the limits of the relief to which plaintiff is entitled as owner of a dominant estate. In rejecting plaintiff’s demands, the trial court concluded Eldorado was not located above Kenmore inasmuch as he found both properties were of virtually the same elevation. The trial court also held that assuming Eldorado to be located above Kenmore, the redress contemplated by plaintiff exceeds the aid legally available to the owner of a dominant estate with respect to drainage of his lands over those of an adjoining owner situated below. We find that the trial court reached the proper result. However, our reasons for so holding differ from those of the lower court in that we find Eldorado to be the dominant estate but also conclude that the servitude of drain existing in its favor does not encompass the specific remedy herein sought by its owner. More particularly, we find that the relief sought by appellant runs afoul of the statutory provision that no action by the owner of a dominant estate may render the natural servitude due by the servient estate more burdensome.
Initially this matter was heard June 16, 1964, on appellant’s rule for preliminary injunction which prayed that defendant be restrained from blocking or otherwise impeding or interfering with the flow of water through the seven channels involved and that defendant be ordered to clear said channels of all obstructions either artificial or natural. Upon conclusion of said initial hearing a stipulation was entered into between the parties and filed of record. The agreement provides in substance that six specifically designated channels would be cleared on Kenmore to their respective natural widths and depths. It also recites that plaintiff could clear those portions of seven enumerated channels on Eldorado by removing all trees and undergrowth therefrom but not in such manner as to widen or deepen them. The covenant also states that plaintiff could clean and clear lateral ditches on Eldorado provided they were not deepened or widened and that plaintiff agreed to dig no new ditches excepting such as would discharge into one of the channels known as Dixie Bayou. Pursuant to the aforesaid stipulation, the trial court rendered judgment June 17, 1964, preliminarily enjoining both parties from violating the terms of the agreement.
On September 26, 1966, the matter was heard on the merits. Subsequently on June 13, 1967, judgment was rendered dismissing and rejecting plaintiff’s demand. This appeal followed.
This action stems from novel attending circumstances which involve a factual situation apparently never heretofore presented to the courts. Narration at this point of certain undisputed relevant events which disclose the historical and current relationship of these estates to each other is deemed necessary to a clear understanding of the positions and contentions of the respective litigants.
Situated in the southern part of Pointe Coupee Parish, subject properties each contain approximately 2,400 acres of land fronting on the west side of Bayou Maringouin, a former distributary of the Mississippi River. From Bayou Maringouin they extend westerly into the Atchafalaya River swamps. The east protection levee of the Atchafalaya Basin Floodway crosses the rear or western portions of each plantation. On the land (eastern) side of the Floodway Levee is the original borrow pit formed in the construction of the Floodway Levee. This borrow pit, known as the Spillway Canal has been dredged and enlarged by local governmental authority to serve as the principal drainage outlet for all properties lying between Bayou Maringouin on the east and the Spillway Levee on the west, including Eldorado and Kenmore. The main portions of both plantations, that is, those areas devoted to crop farming and cattle raising, are situated between Bayou Maringouin and the Spillway Canal and *565 are the only parts of these estates involved in this action. The main line of the Texas and Pacific Railway Company crosses both properties near their front or eastern boundaries, traversing said plantations in a generally northerly-southerly direction parallel to Bayou Maringouin. Eldorado is situated to the north of Kenmore, their common boundary extending along a front of two miles or more. At a point marking the approximate lower third of that portion of Kenmore lying between Bayou Marin-gouin and the Spillway, the Police Jury of Pointe Coupee Parish (Police Jury) has constructed a large canal (Police Jury Canal) extending, for all practical purpose, from Bayou Maringouin on the east through Kenmore to a natural drain situated near the southwesterly corner of Kenmore and from thence southerly into the Spillway Canal. Some distance north of the Police Jury Canal, Holloway has constructed, at its own expense, a canal running from the aforementioned railroad westerly through Kenmore and emptying into the Spillway Canal.
The general vicinity in which subject properties are situated is typical of -the alluvial lands of the lower Mississippi Delta, namely, flat with slight recurring undulations. The same is true of Eldorado and Kenmore. The predominant slope or fall of each estate is from east to west, it being conceded their respective elevations are approximately five feet higher at Bayou Maringouin than at the Spillway Canal. Whether there is a natural slope in the land from north to south sufficient to constitute Kenmore the “lower” estate is the pivotal issue in this lawsuit.
From the northern boundary of Eldorado to the southern limits of Kenmore there is an overall slight decline or fall in land heighth. Plaintiff contends this fall, though admittedly slight, nevertheless causes water to flow naturally from Eldorado onto Kenmore through the crevasse channels in question thus constituting Kenmore the lower or servient estate subject to the correlative obligation of accepting such waters as will flow naturally from the higher to the lower property. Defendant, however, counters with the proposition that Eldorado is not higher or above Kenmore because both are virtually of the same elevation. Additionally defendant urges that the undulations of the estates are such that each plantation is in turn higher and lower than the other in areas along their common boundary, which circumstances results in each naturally draining onto the other at given locations along their line of juncture. Therefore, defendant argues, neither estate is above or below the other and Kenmore owes no servitude of drain to Eldorado.
It is conceded that seven ancient channels, or vestiges thereof, commencing at Bayou Maringouin, run across Eldorado in a northeasterly-southwesterly direction extending onto and, in some instances, completely across Kenmore to the plantation located to the south of or below Kenmore and known as Bellemont Plantation. These conduits known as “crevasse channels” were formed by natural phenomena antedating the memory of living man. Their creation resulted from repeated episodes of high water or flooding in- which Bayou Maringouin overflowed its natural banks and inundated the adjacent countryside, including subject plantations. The flowing waters carried with them, in suspension, particles of soil or silt of varying size, weight and texture, which bits of earth were held in appendage by the turbulence and velocity of the moving water. As the floodwaters spread over the countryside, their rate of motion decreased and degree of turbulence diminished. The consequent diminution in velocity permitted settlement of the suspended silt particles in order of their respective weights, the heaviest bits settling first. The lighter elements were borne farther along, each to settle in its relative turn as the force and movement of the waters gradually subsided. This natural phenomena resulted in the heaviest silt being deposited near their source, Bayou Maringouin, and in such manner the banks of the bayou were *566 gradually elevated and raised above the level of the more remote lands on which lighter particles of sediment were deposited. This process, repeated countless times, created natural levees adjacent to the bayou’s banks. During some floods crevasses occurred in the banks of the bayou, with a consequent scouring of the land producing depressions or conduits known as crevasse channels. In the case at hand these crevasse channels generally run across Eldorado and Kenmore in a northeasterly-southwesterly direction. The banks of these crevasse channels were themselves subject to the same building action as the banks of Bayou Maringouin. Repeated flow of floodwater through the channels caused their banks to “build” or elevate inasmuch as the water flowing over them first deposited its heaviest silt along their edges. It is conceded the channels in question are “bifurcated” or divided, which occurrences generally resulted from the flowing waters encountering some obstacle such as a tree or high ground which impeded their progress and caused them to • separate. The parting thus effected resulted in a single channel dividing into two canals which might themselves thereafter disjoin for similar reason and still subsequently rejoin or unite. In this manner a braided effect was achieved in the crevasse channels on both Eldorado and Kenmore. The process also resulted in the gradual elevation of the crevasse channels banks thusly producing miniature levees along each such channel. In effect, therefore, the areas between the braided channels became basins or “lakes” which trapped falling rainwater and from which the water could not flow until its level therein reached and exceeded the lowest point of its containing embankment.
Although there are remnants of numerous crevasse channels which originate on Eldorado and continue uninterruptedly onto Kenmore, as previously pointed out, only seven were originally made an issue in this present action. Plaintiff’s alleged servitude of drain has been abandoned as to two of said seven channels leaving only five remaining in controversy on this appeal. The easternmost of these channels is designated “Little Bayou” which is situated west of the Texas and Pacific Railroad but generally near the front or east portion of defendant’s property. The two westernmost channels are known as Dixie Bayou and Brown’s Bayou and are located toward the rear of Kenmore an undisclosed distance east of the Spillway canal, both said bayous emptying into the latter facility.
Over the years these several crevasse channels have become blocked or impeded either by natural growth and processes or by the actions of the owners of the respective properties. All said channels excepting Brown’s Bayou and Dixie Bayou have, for all practical purposes, been dammed by the construction of a dirt farm road on Kenmore just south of the Eldorado line, said facility having been erected in the distant past by an unidentifiable former proprietor. It is likewise conceded that since management of Kenmore was placed in the hands of defendant’s present supervisor, James Holloway, in 1938, Mr. Holloway has instituted a program pursuant to which it is proposed to drain Kenmore by a system of artificial canals and cross ditches designed and constructed in accordance with present day scientific and engineering principles. It is readily acknowledged that in the course of placing said plan into effect, defendant has, upon the advice of agricultural experts and the recommendation of qualified engineers, completely obliterated some of these ancient crevasse channels traversing Kenmore. In pursuing said objective, defendant has graded its property, filled or partially filled some of the channels involved in this suit, established cross drains running generally from north to south and constructed other facilities designed to drain Kenmore primarily from east to west by diverting its waters into Holloway Canal and the Police Jury Canal and thence to their ultimate outlet, the Spillway Canal. The purpose of this master plan is to make Kenmore more suitable and adaptable to defendant’s primary pur *567 suits of crop farming (principally sugarcane) and cattle grazing. Plaintiff, having become the owner of Eldorado in the more recent past, desires to improve his said plantation to enhance its use and value as both crop and cattle land. At present Eldorado is used primarily for the grazing of cattle.
Appellant primarily seeks defendant’s injunction from obstructing the natural flow of water from Eldorado onto Kenmore through the five crevasse channels in controversy herein. Plaintiff also requests issuance of an order directing defendant to remove any and all obstacles blocking said natural drains and clear them to their natural widths and depths from plaintiff’s south line southerly to the Police Jury Canal. It is plaintiff’s position that the granting of the relief sought would permit the waters from Eldorado to flow through these natural canals onto Kenmore, which latter estate is legally obligated to receive them, and by natural route flow into the Police Jury Canal from whence they would be borne to their final destination, the Spillway Canal.
Plaintiff urges his alleged servitude of drain under the provisions of LS-R.C.C. Article 660, which reads as follows:
“It is a servitude due by the estate situated below to receive the waters which run naturally from the estate situated above, provided the industry of man has not been used to create that servitude.
The proprietor below is not at liberty to raise any dam, or make any other work, to prevent this running of the water.
The proprietor above can do nothing whereby the natural servitude due by the estate below may be rendered more burdensome.”
Relying on the same codal authority, defendant first contends Eldorado is not situated “above” Kenmore therefore no servitude of drain exists in favor of the one upon the other. Alternatively, defendant argues that if the servitude does in fact exist, plaintiff cannot be granted the relief sought because the privileges accorded include employment, utilization or creation of artificial openings to drain waters which do not flow through natural channels. In this latter regard, defendant first argues that the crevasse channels have never and can never constitute natural drains insofar as Eldorado is concerned. Defendant reasons that since these canals were formed by the action of floodwaters, and their creation is totally unrelated to the run-off action of rainwater, they do not naturally drain plaintiff’s property excepting only the amount of rain water falling directly into them. Defendant next contends that since the banks of these channels are higher than the adjoining basins they encompass, and also considering that they traverse and intercept the predominant direction of flow from east to west, they do not naturally drain the basins formed by their braiding effect. Consequently, according to defendant, the only manner in which water may drain from these low areas into the crevasse channels is through artificial openings in the channel levees. Such artificially created flow, defendant argues, would render more burdensome the obligation of the servient estate by requiring it to receive water other than through natural channels, which result the law and jurisprudence forbids.
In its written reasons for judgment the trial court first concluded no servitude of drain existed in favor of Eldorado. This determination was based on the finding that the respective elevations of the plantations were practically identical, with periodic high and low areas on both properties. The lower court also found that the predominant slope of both estates was from east to west and if there were any slope or fall from north to south, it was so slight as to be of no consequence. In holding that the crevasse channels were not natural drains except for the rainwater which fell therein, the lower court concluded the evidence showed these channels could not *568 drain the low basin areas unless artificial canals were opened into them from the several low areas on plaintiffs property.
Appellant assigns both conclusions of the trial court as error. Additionally, appellant contends the trial court erred in ascribing a “functional” or “objective” interpretation to LS-R.C.C. Article 660 amounting to judicial repeal of the statute. In this respect appellant maintains the trial court in effect held that modern scientific progress in the field of agriculture has demonstrated that for all practical purposes effective and efficient drainage can only be achieved and maintained by artificial means. On this premise appellant argues the trial court in effect found that plaintiff should update his drainage much in the same manner as has defendant, by the grading of plaintiff’s land, the construction of east-west primary drains which will carry plaintiff’s water to the Spillway Canal and the digging of necessary cross drains from north to south to channel water from the low areas into main east-west outlet facilities. Appellant also contends the trial court improperly concluded plaintiff could obtain the relief sought through the beneficence of the Parish Police Jury which was allegedly on record as agreeing to construct an east-west outlet canal across Eldorado the same as said authority had done on Kenmore.
Considering first the issue of whether a servitude of drain exists in favor of Eldorado upon and across Kenmore, we reach the conclusion the trial court erred in finding that Eldorado does not lie “above” Kenmore. We find that whereas the primary slope in subject properties is from east to west, there is also a definite, though slight, overall fall from northeast to southwest. Considerable evidence was adduced by both parties on this crucial issue. However, only brief reference to the testimony of the several witnesses testifying on this question is necessary to support our conclusion that Eldorado is the dominant estate.
Defendant’s witness, Charles W. Dean, consultant Civil Engineer, testifying from a topographical map of Eldorado which he prepared, stated in effect the primary slope on Eldorado was from east to west, its elevation at Bayou Maringouin being approximately five feet above the land height at the Spillway Canal. He also found the elevation at Eldorado’s north line slightly above that at its lower extremity, the direction of decline being from northeast to southwest. In this respect Mr. Dean was corroborated by plaintiff’s witness, Dr. James M. Coleman, a research Geologist. In effect Dr. Coleman testified Dean’s topographic map indicated a general slight slope in the area from northeast to southwest although the principal fall was admittedly from east to west. Similarly, Mr. Benjamin F. Svoboda, Civil Engineer, called by appellant, stated that the contours shown on certain United States Coastal Geodetic quadrangle maps offered in evidence indicate that surface waters on Eldorado would flow in a southerly or southwesterly direction due to the slightly higher comprehensive elevation of Eldorado over Kenmore. In addition, defendant’s manager, James M. Holloway, stated that lands in the area fall from north to south and also east to west. Holloway further testified that water will in some areas flow from Eldorado onto Kenmore. Finally, Mr. James D. Martin, an Agricultural Engineer, called by defendant, testified that whereas the greatest fall in the area was from east to west, the land also fell generally from northeast to southwest.
Defendant strenuously argues the evidence does not support the conclusion that Eldorado is “above” Kenmore because it shows only that the two properties are of virtually the same elevation. Defendant also relies upon Holloway’s testimony to the effect that at points along the common boundaries of the estates, water flows alternately from Eldorado onto Kenmore and from Kenmore onto Eldorado due to the undulating configuration of the properties. On this basis defendant maintains *569 that neither estate may be classified as dominant or servient.
Although defendant’s arguments accurately state the facts, we find the conclusions drawn by appellee therefrom are not valid. It is unquestionably true that at given points along the boundary common to subject estates, water may flow either northerly or southerly depending upon the rise and fall of the land in a particular location. This circumstance, however, is only one aspect of the problem and 'must be viewed in its relationship to other pertinent factors. Although the slope of Eldorado from northeast to southwest is slight, it is nevertheless a fact that it does fall generally onto Kenmore. Granted Eldorado’s southerly decline is not its principal direction of descent, nevertheless to a limited degree, some water will flow naturally from Eldorado onto defendant’s plantation. To the extent which it does flow through natural openings or channels, Eldorado must be considered “above” its southern neighbor. We emphasize, however, that our foregoing remarks pertain only to such surface water as will flow from Eldorado onto Kenmore over ground or through channels into which they ordinarily run because of the natural configuration of the land.
In refutation of defendant’s contention that the remedy asked by plaintiff exceeds the rights granted a dominant estate by law, plaintiff makes two basic contentions. First, it is claimed that notwithstanding the basin areas on Eldorado are surrounded by levees, nevertheless over the years the natural action of water flowing over the land has opened natural canals through these levees permitting at least some of the water in the basins to run by natural means into the crevasse channel outlets. Secondly, it is contended that the opening of artificial drains in the crevasse channel levees falls within the scope of relief available to the dominant estate under the jurisprudence established in Ludeling v. Stubbs, 34 La.Ann. 935, which has interpreted LS-R.C.C. 660 to permit owners of superior estates to construct facilities necessary to the proper cultivation and agricultural development of their properties. According to plaintiff, the applicable statute was so construed for the obvious purpose of encouraging and promoting the adaptation and improvement of land for the vital pursuit of farming and agriculture.
In support of the contention the basin areas on Eldorado drain naturally into the crevasse channels, appellant relies upon the testimony of Dr. Coleman and Mr. Dean. Dr. Coleman stated in substance that natural breaks will occur from time to time in the high banks of the crevasse channels through which some drainage of the basin areas will result. He explained that this natural phenomenon is most likely to happen at those points where two channels rejoin. This occurs, according to Dr. Coleman, because the channels and basin areas themselves generally follow the natural slope of the land thus causing water to spill over the channel banks at their lowest point since flow invariably follows the declining surface over which it moves. Therefore the constant effect of water overflowing these low points creates natural channels which will provide some natural drainage of the various basin areas. Dr. Coleman visited Eldorado on two' occasions, the latter being in March, 1966, during a rain. Visual observation on his last visit disclosed only two areas in which water appeared to be flowing through natural openings from basin areas into crevasse channels. He acknowledged he did not know whether these two particular basins would drain completely. Dr. Coleman also noted several places where water was flowing through channel banks by means of artificial openings. When asked to examine and comment upon Mr. Dean’s topographical map, Dr. Coleman agreed that it indicated numerous areas on Eldorado in which water would be impounded and stagnate. A fair analysis of his testimony, however, is that he could only say that in the areas where water would col *570 lect it would vary in depth from four to six inches to perhaps a foot or more.
Mr. Dean pointed out numerous areas on his topographical map where the natural elevation of channel banks were so low that water would flow from basin areas into the crevasse channels. He was of the opinion that most of these bank openings were of natural origin resulting from the repeated overflow of the basin sections over which were originally the lowest points in the crevasse channel levees. It was his opinion that these natural openings would drain substantially all of the water in most of the basin areas although admittedly there would be two or three areas in which considerable water would not drain. He was of the opinion the crevasse channels are the only natural drains on plaintiff’s estate.
The testimony of defendant’s witness, Dupree, is in direct contradiction of that of Dr. Coleman and Mr. Dean. Dupree concedes the channel levees are not of uniform height. He examined each point on Mr. Dean’s map at which Dean indicated water would flow naturally from basin areas into crevasse channels. Referring to the contours shown on Dean’s map, he concluded that not one such area indicated the presence of a natural opening through which the area could be completely emptied of surface water. Mr. Dupree acknowledged that some water would flow from basin areas over channel banks but that the amount thereof would be relatively little. He concluded that not one basin area could be completely drained by natural openings or low spots in channel banks. Mr. Dupree also noted what appeared to be numerous artificial apertures in these banks.
Mr. Arville Touchet, an agronomist in the employ of the Soil Conservation Service, testified that crevasse channels are not natural drains, which is contrary to the opinion of Mr. Dean. Mr. Touchet explained that a correlation exists between elevation and soil classification. Based on borings from the channel banks and basin areas, which he either personally took or supervised, he concluded there were no natural openings in the banks. Upon examination of Dean’s map, Touchet corroborated Dupree’s finding that no natural breaks in the levee channels were shown thereon.
James D. Martin, an Agricultural Engineer, employed by the Soil Conservation Service, testified for defendant. In effect he stated that from engineering studies and personal ground observation, he found some low spots in channel banks on Eldorado. The substance of his testimony is that whereas an undetermined amount of water could drain through what he considered natural openings in the channel banks, nevertheless there were areas where he observed water standing. He further concluded there were several areas of considerable size where water would stagnate on Eldorado.
From the foregoing we conclude that the crevasse channels in question do constitute natural drains insofar as they naturally drain the rain water which falls therein and also insofar as they serve as outlets for such water as overflows the banks of the basin areas on Eldorado. We further conclude, however, that the extent to which said channels serve as natural drains is negligible or relatively inconsequential insofar as concerns the comprehensive drainage of plaintiff’s property. In this respect Dr. Coleman stated that if there is sufficient water in the basins, drainage will occur over the channel banks but he could not state what percentage would escape either in this manner or through what he considered natural openings. He admitted that unless artificial drains were utilized there were numerous areas which would never drain completely. Mr. Dean testified there were three basins which could not empty naturally. He also stated Eldorado could be efficiently drained only by artificial means. He expanded this thesis by pointing out that crevasse channels would have to be deepened to the *571 depths of the basins to be emptied. In addition artificial cross ditches would be required as well as enlargement of the channels to obtain the needed capacity. Mr. Martin and Mr. Dupree were in agreement that to efficiently drain Eldorado for agricultural purposes, considerable artificial alteration of existing channels was necessary. It is most significant, we think that the evidence contains not the slightest evidence to show that such water as presently flows through these crevasse channels is impounded therein and backs up on Eldorado. Moreover, the evidence is unre-futed to the effect that since the initial hearing of this matter, defendant has reopened the five controversial channels where they leave Eldorado and continue onto Kenmore. Admittedly, defendant has not cleared these drains completely across Kenmore. Unquestionably, however, opening of these channels at the line has or will cause Kenmore to receive more water from Eldorado than was flowing through these channels before defendant opened them at the common boundary. This convinces us there is little, if any, obstruction by defendant of such surface water as flows through these crevasse channels by natural means. We find, therefore, as did the trial court, that the basin areas plaintiff seeks to drain cannot be emptied through the crevasse channels in question except with the aid of extensive artificial facilities to assist them in the process.
In the early case of Martin v. Jett, 12 La. 501, the Supreme Court had occasion to interpret La.Civil Code Article 656 (the counterpart of LS-R.C.C. Article 660). The Martin case, supra, involved a suit by the owner of a dominant estate to compel the opening of a bayou on the property below which bayou had for time immemorial served as a natural drain. The owner of the servient estate countered with the proposition that plaintiff had opened artificial ditches or canals which exceeded plaintiff’s right to construct such facilities to improve his land for agricultural pursuits. The court stated the applicable law thusly:
“Let us see to what extent the corresponding article in the Code Napoleon, has been thought, by able jurists in France, to authorize any artificial works, by which the servitude might be rendered more onerous, with a view of favoring the great interest of agriculture.
Duranton, to whose work our attention has been directed, in commenting upon the 640th article of the Napoleon Code, which forbids the owner of the superior estate to do any thing which might aggravate the condition of the inferior one, says, ‘Thus he cannot make on his land any works, which could change the natural passage (immission) of the waters upon the inferior estate, either by collecting it upon a single point, and giving it thereby a more rapid current, and more apt to carry down sand, earth, or gravel upon the land, or by directing upon a point on the same land a much greater volume of water than it would have received without such works,’ and he cites Book I of the Digest, Section 1. 1 Duranton, No. 164. (Emphasis by the Court.)
But the same author proceeds to say, that the owner of the superior estate may make any work upon it necessary, or simply useful to the cultivation of his land, such as furrows in a planted field. He may, also, in planting vines, or forming a meadow, make ditches for the irrigation of the meadow, or for the purpose of rendering his vines more healthy and vigorous. Ibid, No. 165. (Emphasis by the Court.)
We are by no means disposed to give the code such an interpretation as would in effect, condemn to sterility the superior estate. That every man has a right to clear and cultivate his land, cannot be doubted. The clearing of land, and fitting it for agricultural purposes, is not calculated to render this kind of *572 servitude more onerous. On the contrary, lands, it is well known, become more dry by being cleared, because evaporation goes on more rapidly. But it is one thing to clear and cultivate arable lands, and another thing to reclaim lands naturally covered with stagnant waters, in such a way as to throw the mass of water, which would naturally remain in pools or ponds, upon the lands of one’s neighbor, situated below. The Roman Law, which perhaps, forms the best anticipated commentary upon this part of our code, permitted ditches to be cut by the superior owner, not for the purpose of making the waters flow upon the adjacent land, but for the purpose of improving, by cultivation, his land, and making it more healthy; and laid down the equitable rule, that he ought not to ameliorate his own land to the injury of his neighbors. ‘Sic debare quern meliorem agrum facere, ne vicini de-teriorem faciat.’ Digest, law 1, Section 4.” (Emphasis by the Court.)
In resolving the issue in the Martin case, supra, the court concluded the canals constructed by plaintiff were not simply useful to cultivation but exceeded his right to improve his land for agricultural purposes. So finding, the court reversed the judgment of the trial court in favor of plaintiff and remanded the matter for a new trial.
The rule in Martin v. Jett, supra, was again applied in Ludeling v. Stubbs, 34 La.Ann. 935, wherein the owner of a servient estate sought injunction to compel defendant to fill certain ditches which allegedly diverted rain water from their natural flow to plaintiff’s detriment. Again, the defendant contended the works were such as he was rightfully permitted pursuant to LS-R.C.C. Article 660 in the improvement of his land for agricultural usage. The court concluded that whereas a servitude of drain was owed by plaintiff’s property along a certain portion of their common boundaries, nevertheless, the ditches cut by defendant diverted water from its natural flow and also concentrated some waters so as to make them flow onto plaintiff’s land at some points which they would not have ultimately reached by the slower processes of nature. In so finding, the court remarked:
“The owner of the lower lands of two adjacent estates can do no act which would impede the natural flow of waters on his lands, from those of the higher estate. The owner of the superior estate may make all drainage works which are necessary to the proper cultivation and to the agricultural development of his estate. To that end, he may cut ditches and canals by which the waters running on his estate may be concentrated, and their flow increased beyond the slow process by which they would ultimately reach the same destination.
But the owner of the superior estate cannot improve his lands to the injury of his neighbor, and thus he will not be allowed to cut ditches or canals, or do other drainage works by which the waters running on his lands will be diverted from their natural flow, and concentrated so as to flow on the lower lands of the adjacent estate at a point which would not be their natural destination, thus increasing the volume of water which would by natural flow run over or reach any portion of the lower adjacent estate, or to drain over his neighbor’s lands stagnant waters from his, and to thus render the servitude due by the estate below more burdensome. C.C. Art. 660; Martin vs. Jett, 12 La. 501; Becknell vs. Wiendahl, 7 An. 291; Sowers & Jamison vs. E. Shiff et al., 15 An. 300; Barrow vs. Landry, 15 An. 681; Delahousaye vs. Judice, 13 An. 587; Guesnard vs. Bird, 33 An. 796; Kennedy vs. McCullom, 34 An.” (Emphasis by the Court.)
In contending that defendant should be required to open the crevasse channels in question, plaintiff relies primarily upon Brown v. Blankenship, La.App., 28 So.2d 496 (Ct.App. Second Ciricuit). In short, plaintiff avers that in a situation factually *573 analogous to the one at bar, the servient estate owner was required to clear a bayou of debris which the evidence showed had for many years been the principal outlet for drainage from plaintiff’s lands.
One aspect of defendant’s argument with which we do not agree is the contention that under the applicable law and jurisprudence, primarily Brown v. Blankenship, supra, the owner of the ser-vient estate is not required to do anything but merely to abstain from doing a particular thing (raise a dam or work to prevent the flow of water) but only to permit a certain action (allow water to flow over his land). On this basis it is contended, though not necessarily as appellee’s primary defense, that defendant may not be compelled to do anything on its property even though it is the servient estate. It is clear from the jurisprudence that the obligation of the servient estate extends to the active duty of maintaining all natural channels so that they may receive the water which will naturally flow into them from the estate above. That the owner of the servient estate may be made to clear these channels to serve such purpose is clear beyond doubt. Ludeling v. Stubbs, supra; Brown v. Blankenship, supra.
While plaintiff has the unquestioned right to improve his plantation for agricultural purposes and may construct thereon such artificial means of drainage as he desires, his right to do so is qualified by law. The record convinces us beyond doubt that the only way in which plaintiff’s property may be efficiently and effectively drained for agricultural purposes is by the construction of a comprehensive drainage program including one or more main channels to drain the water from east to west conformable to the predominant slope of the land. To effectuate such a plan requires the opening of numerous artificial cross ditches and drains to channel the water from the basin areas into the crevasse channels and from thence into one or more trunk outlets. From the record before us, it is patent that the opening of artificial canals in the crevasse channel banks as contemplated by plaintiff would divert the natural flow of water on plaintiff’s lands. In addition, it would result in a concentration of water producing not only an increase in flowage velocity (which is within plaintiff’s rights) but also causing water to flow onto defendant’s lands at points which they would not have reached by slower natural processes, which latter result is proscribed by law. Finally, it is clear beyond doubt that the measures desired by plaintiff will drain stagnant water from low spots on Eldorado which do not presently drain by natural means, an end likewise interdicted under our law. Clearly such exercise of plaintiff’s servitude would render the obligation of the servient estate more onerous contradictory to the express terms of the applicable statute.
The conclusions reached make it unnecessary to consider defendant’s alternative argument that if the servitude did exist in favor of plaintiff’s property, it has been abandoned by plaintiff converting the drainage of his plantation from natural to artificial facilities.
We are of the view that there is much to be said regarding the merits of defendant’s contention that LS-R.C.C. Article 660 should’ be interpreted “functionally” and “objectively” in the light of modern engineering discoveries and present day scientific knowledge of draining farm lands by comprehensive artificial systems. Such an approach cannot ignore statutory law on the subject. It does, however, and should permit the basic and fundamental legal rules to be logically and reasonably applied in the light of modern engineering principles and present day development in the technique of artificial drainage of farm lands. This proposal we believe necessary to effectuate, in the light of developments unknown at the time of adoption of the applicable legislation, the plain intent of the law to encourage the development of land for the most vital pursuits of agricul *574 ture and farming. We do not, however, find it necessary to indulge in such an approach in the case at hand. We find that under the terms of the statute itself, plaintiff is not entitled to the relief sought.
Accordingly, it is hereby ordered, adjudged and decreed that the judgment of the trial court be and the same is hereby amended in that a servitude of drain be and the same is hereby found and declared to exist in favor of Eldorado Plantation, the property of plaintiff Jerry K. Nicholson, over and upon adjoining Kenmore Plantation belonging to defendant, Holloway Planting Company, Inc., said servitude being exercisable in conformity with the law as herein expressed.
It is further ordered, adjudged and decreed that the preliminary injunction granted by the trial court prohibiting plaintiff Jerry K. Nicholson from opening artificial drains in the banks of the crevasse channels on Eldorado Plantation belonging to said plaintiff, be and the same is hereby made permanent and said plaintiff perpetually so enjoined.
It is further ordered, adjudged and decreed that all costs of these proceedings both in the trial court and on appeal, be paid jointly by plaintiff Jerry K. Nicholson and defendant Holloway Planting Company, Inc.
Amended and rendered.
Before LANDRY, REID, and SARTAIN, JJ.