PICKETT, Judge.
The plaintiffs and the defendants own adjoining tracts of land in St. Tammany Parish, which is located between Highway 190 on the north, Lake Pontchartrain on the south, Tchenfuncta River on the east, and Bedico River on the west. The plaintiffs own the Northwest Quarter of Section 20, the South Half of Section 19, and all of Section 30, Township 7 South, Range 10 East; and the defendants own the South Half of Section 20, Section 29, and Section 31, Township 7 South, Range 10 East, in St. Tammany Parish. Both plaintiffs and defendants own other lands *355 contiguous to their properties above described. The plaintiffs’ lands are located generally to the North and West of the defendants’ lands.
The plaintiffs instituted this suit in which they allege that their properties drain naturally, and by means of a canal situated on their common boundary for more than fifty years, onto and across the lands of the defendants, because of which they have a natural and acquired servitude of drain in favor of their properties over the defendants’ lands. Plaintiffs allege that defendants have constructed levees, between their properties and the lands of the defendants, which obstruct not only the natural drain from their lands onto and across the properties of the defendants, but, also, obstructs the acquired drain through a canal, known as the Dendinger Canal; and that they are entitled to a mandatory injunction requiring the defendants to remove said levees, and a prohibitory injunction restraining the defendants from maintaining said levees. Plaintiffs, also, ask for damages against the defendants in the sum of $70,000.00, alleged to have been cause to their property by the construction and maintenance of said levees. The defendants’ chief defense is that plaintiffs’ property is not situated “above” their lands and, therefore, is not a dominant estate, consequently no servitude of drain exisits in favor of plaintiffs’ estate upon defendants’ properties. Furthermore, defendants deny that the levees complained of by plaintiffs obstructed any drainage from plaintiffs’ property, or that any damage was done to plaintiffs’ property because of the levees. The defendants also deny that plaintiffs have any right to secure drainage rights from their property onto defendants’ lands. The defendants interposed a plea of prescription of one year as a bar to plaintiffs’ right to recover for timber damages.
This case was called for trial July 10, 1967; and after taking testimony for one day, the case was continued by consent of both parties. Thereafter, the defendants filed a supplemental answer and reconven-tional demand in which they alleged that plaintiffs have allowed and caused to be made openings in their own levee systems which have permitted tidal waters to enter their lands and that they have failed and neglected to take the necessary action to relieve themselves of water that floods their property. Furthermore, they accuse the plaintiffs of having willfully made two cuts in defendants’ levee to relieve themselves of surplus water; and that by thus taking the law into their own hands they have violated the ancient “clean hands” maxim; hence, their suit for equitable relief should be dismissed. The defendants aver that because of the plaintiffs having made two cuts in defendants’ levee system that cost them at least $1,000.00 to repair, they are entitled to damages for that amount, plus undetermined damages to their agricultural crops. An exception of no cause or right of action filed by defendants does not appear to have been acted upon by the District Court, and hence will not be reviewed by us.
The appellants first assignment of error is that the lower court erred in not invoking the doctrine of “clean hands” and dismissing plaintiffs’ suit, because during the pendency of the suit plaintiffs caused openings to be made in the levee. The evidence shows that some time prior to the trial of this case, the plaintiff Weldon Poole, accompanied by his attorney, broke the levee in two places between the properties of the plaintiffs and the lands of the defendants. Referring to this action on the part of the plaintiff and his attorney, the lower court said: “Although this Court does not condone the action of the plaintiff and his attorney, the Court does not believe it is grounds for dismissal of this action.” We most assuredly agree with the trial court that the action of the plaintiff and his attorney in breaking the levee cannot be condoned; but we do not believe, considering all the issues involved, that this suit should be dismissed for that reason alone.
*356 After a trial on the merits, judgment was rendered in favor of the plaintiffs granting the injunctive relief sought, and awarding plaintiffs the sum of $4,511.37, together with interest from judicial demand until paid and all costs of suit, and dismissing defendants’ reconventional demand. The defendants have appealed sus-pensively. The plaintiffs have neither appealed, nor answered the appeal.
After a careful examination of the oral evidence and the exhibits filed in evidence, we agree that the physical characteristics of the property here involved are substantially as outlined by the Trial Judge as follows :
“The property of plaintiffs is located generally to the North and West of defendants’ property, and the two properties join at the East line of the Poole property and the West line of the Guste property. Both properties are located between Highway 190, the Madisonville-Ponchatoula Highway to the north, and Lake Pontchartrain to the south. Located along the common section line of Sections 19 and 30 belonging to the plaintiffs, and Sections 20 and 29 belonging to the defendants is a canal known as the Dendinger Canal. This canal runs generally in a north-south direction. It empties to the south into a canal known as the Bedico or Main Canal which runs generally in an east-west direction. The Dendinger Canal heads at the north in Section 19, belonging to the plaintiff. It then runs southeast until it reaches the Guste property where it turns south until it hits the Bedico or Main Canal. The Dendinger Canal was constructed in 1916 as the result of a contract entered into between the ancestors in title of plaintiffs and defendants. The contract states that the canal was to be constructed because one of the parties, Edward J. Frederick was desirous of having a canal down on the western edge of his property that would connect with the Main Canal, and the other, Theodore Dendinger, Sr., was desirous of having a canal he could use to transport timber. A connection of the canal so constructed, the Dendinger Canal, to the Main Canal resulted in an outlet into Lake Pontchartrain since the Main Canal empties into Tchefuncta River on the east and Bedico Creek on the west, both of which empty into Lake Pontchartrain. As constructed the Dendinger Canal was about (30) thirty feet wide and (6) six or (7) seven feet deep. It was readily usable by fairly large sized boats. It should also be noted that at the time the Dendinger canal was constructed, its southern portion was built immediately east and parallel to another canal which was already in existence, and ran generally north and south between Sections 29 and 30. This canal was known as the ‘Peters’ Canal, and was so referred to in the agreement between Mr. Frederick and Mr. Koepp. The ‘Peters’ Canal was apparently constructed as part of a rice operation carried on in Section 30 in a place referred to as the Peter’s rice field. The Peter’s rice field was, and remains, protected on the north by a levee known as the ‘Peters’ levee.
“The evidence indicates that both of the properties are low lying properties which start with a mean sea level of about 0.5 at the main canal, and increase to about 2.0 to 2.2 at the section line between sections 20 and 27, and 19 and 30. The Dendinger Canal heads just above these section lines. Above this, the property rises rather gradually to about the midway point of Sections 19 and 20. Then it rises sharply until it reaches approximately 20.0 feet above sea level at Highway 190. However, located on the Poole property, there are so-called pine islands. These islands are places where there will be an increase in the height of the property to four, five or six feet above sea level. These islands flourished with pine trees, and thus the name ‘pine islands.’ The evidence indicates there are two main pine islands located on the Poole property called ‘big pine’ and ‘little pine’ islands.
*357 The plaintiffs contend that prior to the construction of levees, canals, drain ditches or other works on the subject property, rain water falling on their lands as well as tide water flowing from Lake Pontchartrain onto their lands, drained naturally onto defendants’ lands, and that they have a servitude of drain under the provision of LSA-C.C. Article 660, which reads as follows :
“It is a servitude due by the estate situated below to receive the waters which run naturally from the estate situated above, provided the industry of man has not been used to create that servitude.
“The proprietor below is not at liberty to raise any dam, or to make any other work, to prevent this running of the water.
“The proprietor above can do nothing whereby the natural servitude due by the estate below may be rendered more burdensome.”
The plaintiffs further contend, in the alternative, that if they have no servitude under the provisions of the above cited Article of the Louisiana Civil Code, they have a servitude of drain under the provisions of LSA-C.C. Article 709, or LSA-C.C. Article 765. Article 765 of the Louisiana Civil Code provides:
“Continuous and apparent servitudes may be acquired by title, or by a possession of ten years. The public, represented by the various parishes in this State, may also in like manner acquire a servitude by the open and public possession and use of a road for the space of ten years, after the said road or servitude has been declared a public highway by the Police Jury, provided that such servitude so acquired shall not extend beyond the width of forty feet. As amended Acts 1904, No. 25.”
The lower court concluded that under the facts in this case the plaintiffs’ estate is entitled to a servitude of drain onto the 4efendants’ property under the provisions of either of the above cited codal articles. In his written reasons for judgment the Trial Court expressed the following conclusions :
“Therefore, under the facts and the law, the Court holds that the Poole estate is entitled to a servitude of drain into the Guste estate under Article 660 of the Civil Code. This being true, it is unnecessary to determine whether the Poole estate also has a servitude under Article 765 of the Civil Code. However, it should be pointed out that under its findings of fact, the Court believes that the servitude would also be owed the Poole estate by the Guste estate under this Article.”
In order to prevail under the provisions of LSA-C.C. Article 660, the burden is on the plaintiffs to prove by a preponderance of the evidence that the elevation of their lands is higher than the defendants’ estate so that the waters will flow naturally from plaintiffs’ properties onto the lands of the defendants. Although there is some conflict in the testimony, and it is probably true that at some points between plaintiffs’ property in Section 19, and the defendants’ lands in Section 20, water may have flowed either easterly or westerly depending upon the elevation at a particular point, witnesses who were familiar with the area here involved prior to the contruction of the Dendinger Canal testified that generally the water flowed in a southeasterly direction from plaintiffs’ estate onto defendants’ lands. The undisputed evidence is to the effect that water from the north of the subject properties flowed through two natural drains onto plaintiffs’ property in Section 19. One of these natural drains called Alligator Bayou flows through said section on the east side of Little Pine Island, and the other drain called Steepgut flows on the west side of Little Pine Island. Before any canals or levees were constructed in the area, water from the north flowed through a drain called Congo Branch southerly across *358 the northwest quarter of Section 20, thence it meandered southwesterly into a depression, or swamp in the southeast corner of Section 19, thence back across defendants’ land toward Lake Pontchartrain. Water brought in by Alligator Bayou flowed into a swamp east and south of Little Pine Island and found its way out through the swamp over onto defendants’ property in Section 29. Drainage from Steepgut flowed into a swamp west and south of Little Pine Island that extended across the northern portion of Section 30 north of Big Pine Island, and then drained onto and across defendants’ lands in a southeasterly direction. There is substantial evidence that some of the water from Steepgut flowed westerly and into Bedico Creek, which is a tributary of Tangipahoa River.
There was filed in evidence as plaintiffs’ Exhibit P-5, the U. S. Coast and Geodetic Survey Quadrangle of the area under consideration, revised in 1951. Mr. Robert Berlin, a surveyor, and an expert witness on behalf of the defendants, testified that the above mentioned Geodetic Survey Quadrangle shows that the vegetation going north from Lake Pontchartrain is marsh grass, then cypress, gum, and pine, respectively. He further pointed out that the area nearest to Lake Pontchartrain in Section 33 showed that the vegetation was saw grass, and that Sections 29 and 30 were labeled gum swamp. He agreed that the saw grass marsh was of a lower elevation than that of the gum swamp. The pine grew at a higher elevation than that of the gum. In other words, the testimony of Mr. Berlin is that as you proceed from Lake Pontchartrain in a northerly and westerly direction, the rise in elevation produces first saw grass, then cypress, gum, and pine. Herbert Frederick, a former owner of that part of the defendants’ property situated in Sections 20, 21 and 29, testified that he had been familiar with this property all of his life. In fact, his father, E. J. Frederick, owned it prior to the time he owned it. He said that prior to digging the Dendinger Canal, the natural draining in that area passed through Sections 20 and 29 and on towards the Lake in a southeasterly direction. After the Bedico Canal was opened from the Tchefuncta River westward to the Bedico Creek, the water then drained from Sections 20 and 29 southeasterly into the Bedico Canal. The evidence further shows that tide waters from Lake Pontchartrain frequently overflowed the subject lands, particularly the low level swamp lands. The water brought inland by the tide generally receded in the same direction that it entered.
The Dendinger Canal was constructed in 1916. According to the testimony of Mr. Eddie Champagne, a surveyor and expert witness for plaintiffs, the water that had formerly drained from plaintiffs’ estate onto defendants’ lands, particularly Section 20 and 29, was carried away through the Dendinger Canal and the Bedico Canal to Lake Pontchartrain. Water from the low land in the southeast corner of Section 19 of plaintiffs’ land drained into the head of the Canal; and the water from the low lands in Section 30 north of the Peters Rice Field drained into the Dendinger Canal through a natural drain which formerly carried the water onto and across defendants’ property. Mr. Berlin admitted that he traveled the road, or causeway, that the plaintiffs had constructed from the northern edge of Pine Island to Little Pine Island, and that he noticed there was debris washed up along the west side of the causeway, which indicated that water had attempted to go over the road from the west, flowing in a southeasterly direction. He stated that he actually saw the water flowing southeasterly under the bridge at the opening in the Dendinger Levee. Russell Lobell and others testified water drained from the plaintiffs’ lands into the head of the Dendinger Canal and into the Canal through the opening at the bridge in the Dendinger Levee, and thence on into the Bedico Canal, before the defendants closed the opening in the spoil bank and the opening from the Dendinger Canal into the Be-dico Canal. From a careful examination *359 of all the evidence, we conclude, as did the Trial Judge, that the natural drainage from the plaintiffs’ property was southeasterly across defendants’ property; and that after the construction of the Dendin-ger Canal, the principal change in drainage was through the canal rather than across the defendants’ property. Furthermore, if the natural drain was west and not east, or southeast, there would have been no reason to close the opening at the bridge in the Dendinger Levee, nor to fill the Canal where it entered defendants’ lands. A similar observation was made by the Supreme Court in Broussard v. Cormier, 154 La. 877, 98 So. 403, wherein the Court said:
“If the natural drain was west and not north, as contended for by the defendant, there would, it seems to us, have been no occasion for the defendant to maintain the levee south of his ditch and next to the line of plaintiff’s property. The levee was obviously constructed to protect the ditch and property of defendant from the waters flowing from plaintiff’s land.”
The Trial Judge after hearing and observing the witnesses, and visually inspecting the subject property, concluded that the plaintiffs’ estate is entitled to a servitude of drain onto the defendants’ lands. The rule is firmly established in our jurisprudence that, in the absence of manifest error, the trial judge will not be reversed on questions of fact involving the credibility of witnesses who testified before him. After a careful review of the record, we concur in the findings of the Trial Court that the plaintiffs’ estate is the dominant estate and is owed a servitude of drainage by the estate of the defendants under the provisions of LSA-C.C. Article 660. We, also, agree with the Trial Court that having found that plaintiffs’ estate is entitled to a servitude of drain under the provisions of LSA-C.C. Article 660, it is unnecessary to determine whether the plaintiffs’ estate has a servitude under the provisions of LSA-C.C. Article 765.
The appellants contend that even though their estate may owe a servitude of drainage to the appellees’ estate, they have a right to protect their property from flood water. The issue here is not the right of the servient estate to protect itself from overflow water, but whether the plaintiffs have the right to require the defendants to open the levee so that the water from their estate can flow into the Dendinger Canal as it has for more than fifty years. As was pointed out by the lower court, if the defendants so desire, they can protect their lands from overflow from the Dendinger Canal by the construction of a levee on the east side of the Canal. The appellants have the right to improve their property for agricultural purposes, and to place thereon such ditches and levees as they may desire, but they cannot improve their land to the injury of the dominant estate. In Nicholson v. Holloway Planting Company, 216 So.2d 562, this Court said:
“It is clear from the jurisprudence that the obligation of the servient estate extends to the active duty of maintaining all natural channels so that they may receive the water which will naturally flow into them from the estate above. That the owner of the servient estate may be made to clear these channels to serve such purpose is clear beyond doubt.”
The Trial Court in written reasons for judgment made the following comments:
“Both estates would remain equally productive if the Dendinger Canal were opened and the levee were placed on the east side. In not doing this in the first place, the defendants showed a total disregard for the agricultural products being grown on the Poole estate. The Court can only conclude that the defendants in reclaiming their property had no consideration for the effects of their works on the Poole property, but rather were concerned primarily with saving cost by using the old levee or fill road as the base for the new levee, and having the Dendinger Canal available for inter *360 nal drainage. In fact, in building the levee where they did, defendants not only obstructed a natural drain, but used part of plaintiff’s property to do so.”
Having concluded that the natural drainage of plaintiffs’ property is into the Dendinger Canal, we agree with the Trial Judge that the appellants should be required to open the Dendinger levee at the point of the old bridge so that the water can flow from plaintiffs’ estate in the Den-dinger Canal. The appellants should also be required to reopen the Dendinger Canal into the Bedico or Main Canal. Furthermore, the defendants should be restrained from obstructing the draining from the plaintiffs’ estate into the Dendinger Canal.
The appellants complain that the lower court erred in finding that the levee caused timber damage. Mr. Jim Curtis, a graduate forester, testified for the plaintiffs with reference to the timber damage. He said he cut pulpwood from the plaintiffs’ lands in the southeast corner of Section 19, in the areas designated and marked J2 and J3 on plaintiffs’ Exhibit P-2, in the early part of 1951, or 1952. In 1967, Mr. Curtis cruised the area in which plaintiffs claim their timber was damaged by flooding after the levee was constructed by appellants. He found dead and dying timber that in his opinion was caused by flooding. Mr. Willie Weaver, a consulting forester, called as a witness by the plaintiffs, testified that he made a damage appraisal of the plaintiffs’ timber caused by flooding, and the infestation by insects resulting from the lowered vitality of the timber because of the flooding. He made a one hundred percent tree count of the timber loss; and explained the cause of the damage to plaintiffs’ timber. The Trial Judge clearly and concisely analyzed the evidence relative to the cause of plaintiffs’ timber damage in his reason for judgment as follows :
“There seems to be no question that an exceptional timber death has occurred in the two areas 13 and J3 on plaintiff’s exhibit #2, which exceeds the normal mortality rate. The actual number of trees dead above normal mortality were counted by Mr. Billy Weaver whose count the Court accepts. The experts agree that the increased mortality is caused by infestation of insects including Ips and Turpentine beetles. All agree that these beetles successfully infest trees only when the vitality of the tree is affected by some change of environment which reduces its capacity to withstand infestation. The plaintiffs claim purely and simply that the change of environment is a change in the water table in the area due to the Guste levee. Defendants, on the other hand, claim a combination of occurrences caused the damage, consisting in order of a fire, hurricane Betsy, and an increase in the salinity of Lake Pontchartrain. Suffice to say that from the Court’s previous findings of fact as to drainage, there must necessarily follow a change in the water table in the precise areas where the damage is occurring. On the other hand, the Court can find no logical reason why all the natural disasters claimed by the defendants would have limited timber damage to the two areas admittedly involved. The Court believes that the fire, storm and increased salinity raise mere possibilities, while the evidence preponderates to the effect that the damage is caused by an increase in the water table due to obstructed drainage.”
The Trial Court concluded that the plaintiffs are entitled to recover the value of the timber that was found dead, in July, 1967, as a result of the flooding caused by appellants’ levee. Having carefully considered the record and the evidence of the witnesses, both for the plaintiffs and the defendants, we believe that the Trial Court correctly concluded the plaintiffs’ timber has been damaged as a result of the levee flooding their lands, and that they are entitled to recover the value of their timber loss.
*361 The appellants filed a plea of prescription of one year as a bar to plaintiffs’ right to recover damages for the loss of timber. LSA-C.C. Article 3537 provides that in the case of damages to timber, the prescription runs from the date knowledge of such damage is received by the owner thereof. The plaintiff, Weldon Poole, testified that he learned of the damage to his timber in May, 1966. Judge Wallace Edwards testified that Mr. Poole called him on May 6, 1966 about the drainage problem. The Trial Court did not believe that “Mr. Poole’s testimony that he did not find out the levees had been constructed and causing damages until May of 1966” had been contradicted by sufficient proof. This suit was filed on April 13, 1967. Hence we concur in the findings of the Trial Court that the plea of prescription should be overruled.
The Trial Judge awarded to plaintiffs damages in the sum of $3,807.83 for the loss of saw timber, and the sum of $703.54 for the loss of poles and piling. We do not think the Trial Judge has abused the great discretion given him as to the amount of damages.
Furthermore, our examination of the record convinces us that the Trial Judge was justified in denying the recon-ventional demand of the defendants.
On January 8, 1971, the appellants filed a motion and rule to show cause why ap-pellees’ injunction suit should not be dismissed and the judgment of the Twenty-Second Judicial District Court appealed herein should not be reversed under the “clean hands” doctrine of equity. The motion alleges that a suspensive appeal was taken from said judgment, and that thereafter, on or about December 7, 1970, appellants discovered that the levee, constructed by them, at the location specified in said judgment, had been forceably broken through and opened, and that a large portion of the levee had been reduced in height by the use of equipment originating from the property of the plaintiffs-appel-lees. The motion further alleges that the depositions of Ira Paul Simoneaux and Weldon W. Poole taken on January 5, 1971, which are annexed to the motion, show that plaintiff-appellee, Weldon W. Poole, opened the levee at the point referred to in said judgment, and that he thereby brought himself within the equitable doctrine of “clean hands”, and violating the order of suspensive appeal.
 LSA-C.C.P. Article 191 declares that: “A court possesses inherently all of the power necessary for the exercise of its jurisdiction even though not granted expressly by law.” This court has jurisdiction to review the judgment of the district court from which this appeal is taken; and has the inherent power for the exercise of its jurisdiction. This court has jurisdiction to review the judgment rendered by the district court, and has the power necessary to execute that function. The appellants have asked this court to take cognizance of alleged wrongful and tor-tious acts committed by the plaintiffs-ap-pellees which arose during the pending appeal ; and, in fact, try the merits of the issues raised in their motion. We do not believe the alleged tortious acts of the plaintiffs-appellees should be reviewed on this appeal. We are not unmindful that a person having a legal or equitable right needing judicial protection is generally entitled to a remedy adequate to the situation. We believe the appellants have an adequate remedy in the District Court for any relief to which they are entitled because of the alleged tortious acts of the appellants. Therefore, the appellants’ motion and rule to show cause herein, as hereinabove set forth, is denied.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendants-appellants.
Affirmed.